UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------------- x

VEERA VENKATA NARASIMHA                 :
NARENDRA PHANI KOTTAPALLI,              :
                                        :
                          Plaintiff,    :        **MEMORANDUM &**
                                        :        **ORDER**
          -against-                     :
                                        :        3:21-CV-01076 (VDO)
ASML US, LP,                            :
                                        :
                          Defendant.    x

------------------------------------------------------------------

**VERNON D. OLIVER**, United States District Judge:

Veera Venkata Narasimha Narendra Phani Kottapalli ("Plaintiff" or "Kottapalli")
commenced this employment action against ASML US, LP ("Defendant" or "ASML"),
asserting five claims: (1) retaliation, in violation of Conn. Gen. Stat. § 31-51q; (2) wrongful
discharge; (3) race discrimination, in violation of Title VII of the Civil Rights Act of 1964; (4)
retaliation, in violation of Title VII; and (5) negligence. (Compl., ECF No. 1 ¶¶ 79–111.) The
Court previously dismissed the first claim under Federal Rule of Civil Procedure 12(b)(6).
This matter is before the Court on Defendant's motion for summary judgment on the remaining
claims. After careful consideration of the record, the Court finds that the matter is appropriate
for a decision without a hearing.

For the following reasons, the pending motion is **granted** as to the federal claims. The
Court declines to exercise supplemental jurisdiction over the remaining state law claims and
dismisses those claims without a decision as to their merit.

## I.    BACKGROUND

The Court assumes familiarity with the facts and prior proceedings of this case. The
following facts are taken from Defendant's Local Rule 56(a)1 Statement of Undisputed

Material Facts ("Def.'s 56(a)," ECF No. 39-1), Plaintiff's Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment ("Pl.'s 56(a)," ECF No. 46-1), the Complaint, and the record. The facts are recounted "in the light most favorable to" Plaintiff, the non-movant. *Torcivia v. Suffolk Cnty.*, 17 F.4th 342, 354 (2d Cir. 2021). The facts as described below are in dispute only to the extent indicated.

### A.      The Parties

Defendant, a limited partnership incorporated under the laws of Delaware and headquartered in Arizona, is a manufacturer of lithography machines used by companies to produce microchips for smartphones and other devices. (Answer, ECF No. 28 ¶ 7; Def.'s 56(a) ¶ 1.) Defendant has several plants in the United States, including one in Wilton, Connecticut. (Def.'s 56(a) ¶ 2.)

Plaintiff, a citizen of India, began working in the United States in 2008 on an H-1B visa. (*Id.* ¶ 5.) ASML US Inc. originally hired Plaintiff on October 22, 2012 as a Design Engineer 2 and, in January 2017, promoted him to the position of Senior Design Engineer 1. (Answer ¶ 11.) After a reorganization of ASML US Inc., Plaintiff began working for Defendant in January 2018. (*Id.* ¶ 12.) Defendant sponsored Plaintiff's H-1B visa and green card application. (Def.'s 56(a) ¶ 6.)

### B.      Plaintiff's Employment

As a Design Engineer, Kottapalli's job responsibilities included developing solutions that could improve the design and functionality of ASML's lithography machines. (*Id.* ¶ 7.) If a solution involved a new invention, Plaintiff was required to fill out an Invention Disclosure Form ("IDF") describing his invention, which Defendant used to determine whether the invention was valuable enough to pursue a patent. (*Id.* ¶ 8.) The inventor would then be asked

to review the patent application and sign documents to assign their rights to ASML. (*Id.*) Plaintiff, like all ASML employees, signed an Intellectual Property Agreement at the start of his employment in which he agreed to cooperate with the patent process and to sign any paperwork necessary to assign his rights to the invention over to ASML. (*Id.* ¶ 9.) The application is then filed at the appropriate patent office. (*Id.*)

Plaintiff reported to Andy Judge until August 2018. (*Id.* ¶ 3.) In August 2018, Ryan Munden joined ASML and took over as Plaintiff's manager until Plaintiff's termination. (*Id.* ¶ 4.)

### 1.     Plaintiff's Involuntary Transfer

In early 2018, Defendant moved employees to assist the software architectural group tasked with availability improvements, which was a major system priority. (*Id.* ¶ 53.) As a result, Plaintiff was transferred from EUV HR to DUV RH. (*Id.*) Plaintiff's transfer from EUV to DUV was a lateral transfer insofar as he kept the same job grade, pay rate, and level of responsibility. (*Id.* ¶ 52.) Plaintiff's coworker, Robert Weiner, called him a "lucky bastard" in a meeting shortly after Plaintiff transferred from EUV to DUV. (*Id.* ¶ 59.)

### 2.     Plaintiff's Refusal to Sign Patent Paperwork

During his employment, Plaintiff and others conceived of an invention. (*Id.* ¶ 10.) Defendant asked Plaintiff to sign initial patent paperwork to begin the patent process in December 2017, which he did. (*Id.*) ASML then decided to bundle Kottapalli's invention with inventions by other authors into a "family patent." (*Id.*) ASML sent the family patent to Kottapalli, which he refused to sign because he was not given credit for some of his ideas. (*Id.* ¶ 11.) In response to Plaintiff's concerns, the Wilton Patent Team completed an investigation. (*Id.* ¶ 12.)

On June 28, 2019, ASML made one final request of Plaintiff to sign the family patent. (*Id.* ¶ 13.) Kottapalli refused to sign the patent assignment and declaration forms that were to be submitted to the U.S. Patent and Trademark Office ("USPTO") because he did not have sufficient information about the other employees' inventions to be able to truthfully attest to the validity of their claims. (*Id.* ¶ 39.) Kottapalli claimed he needed more information from ASML to understand who submitted each claim in the application, what background evidence supported each claim, and whether each claim was a genuine co-invention not copied from someone else. (*Id.* ¶ 42.) Kottapalli also claimed he wanted more information to verify the legitimacy of ASML's patent claims and asserted that ASML might be misrepresenting inventorship. (*Id.* ¶ 43.) Kottapalli determined that the information ASML provided to him was insufficient and he "desire[d] to not violate a federal law about submitting correct information" to the USPTO. (*Id.*) Nevertheless, Defendant still paid Plaintiff his share of the patent award. (*Id.* ¶ 13.)

### 3.    Plaintiff's Performance Evaluations and Subsequent Termination

During the relevant time period, ASML evaluated its employees' performance in two categories – the "what" (the results an employee achieves), and the "how" (the values the employee exhibits when they do the job). (*Id.* ¶ 14.) Employees receive a year-end review called a "PPM" with their final performance rating, which is delivered in the first quarter of the following year. (*Id.*)

### a.    2018 Performance Evaluation

In mid-2018, Plaintiff communicated with a colleague, Adam Kohl, about the "how" aspect of his job performance after Judge advised him that he should seek feedback from his coworkers. (*Id.* ¶ 15.) Kohl gave him mostly constructive feedback. (July 9, 2018 Email, ECF

No. 39-13, at 3–4.) Plaintiff referred to Kohl's assessment as "false and conflicting" and requested a meeting to convince Kohl that he was wrong in his assessment. (*Id.* at 3.) At the end of 2018, Plaintiff was rated "below expectations" for the "how" side of his job performance in his year-end PPM. (Def.'s 56(a) ¶ 17.)

Plaintiff then appealed his performance score. (*Id.* ¶ 19.) During an appeal process, an employee is required to meet with their direct manager within four weeks of submitting the written appeal to attempt to resolve the employee's concerns through mutual consultation. (*Id.* ¶ 18.) If the employee and direct manager cannot agree on an acceptable solution (or if there is no response to the employee's written appeal), then the employee can seek review from the Sector Head. (*Id.*) Kottapalli's performance score was upheld at both levels of review. (*Id.* ¶ 19.)

Subsequently, Plaintiff emailed Peter Bailliere, ASML's Executive Vice President of Human Resources ("EVP-HR"). (*Id.*) Mr. Bailliere informed Plaintiff that he was not a member of the ethics group or part of ASML's open door process, and encouraged Plaintiff to reach out to the appropriate individuals who could help him with his concerns. (*Id.* ¶ 21.)

### b.    2019 Performance Evaluation and Termination

On February 10, 2020, Munden met with Plaintiff to provide his 2019 PPM score, and as soon as Plaintiff learned he had once again been rated "below expectations" on the "how," Plaintiff walked out of the meeting and vowed to appeal his review. (*Id.* ¶ 24.) From that date forward, Plaintiff refused to meet with Munden one-on-one because he requested that Mark Schuster be present in any meetings with Munden. (*Id.*; Pl.'s 56(a) ¶ 24.)

On February 21, 2020, Cynthia Houston and Munden sent Plaintiff an email outlining each step in the appeal process and the deadline by which each step had to be completed.

(Def.'s 56(a) ¶ 25.) Next, Houston scheduled a meeting for February 24, 2020 to complete Step 2 of the appeal process, which required Plaintiff to meet with Munden to attempt to resolve his disagreement with his performance rating through mutual consultation. (*Id.*) Plaintiff refused to meet with Munden until he had a meeting with Schuster. (Pl.'s 56(a) ¶ 26.) Plaintiff's appeal expired because he never met with Munden to discuss his performance appraisal. (Def.'s 56(a) ¶ 27.)

Following the expiration of Plaintiff's appeal on March 21, 2020, Plaintiff was instructed to resume regular meetings with Munden. (*Id.*) Houston and Munden scheduled a March 25th meeting with Plaintiff to discuss the conclusion of his PPM appeal and the need to place him on a performance improvement plan ("PIP"). (*Id.*) Plaintiff met with Houston and Munden on March 25, but refused to discuss his job performance. (*Id.* ¶ 28.) Plaintiff was then sent a written warning. (*Id.* ¶ 29.)

During a March 31, 2020 meeting, Houston reiterated to Plaintiff that his appeal had expired, and that he was expected to meet directly with Munden going forward. (Def.'s 56(a) ¶ 30.) Plaintiff acknowledged that his appeal expired, that he was required to meet with Munden on a weekly basis, that he was required to execute a PIP, and that he could be fired if he failed to do any of these things. (*Id.* ¶ 30.) Plaintiff continued to refuse to meet with Munden alone, and would hang up on Munden's phone calls. (*Id.* ¶ 31; Pl.'s 56(a) ¶ 31.)

On April 30, 2020, ASML issued Plaintiff a final written warning. (Def.'s 56(a) ¶ 32.) Then, when Munden and Houston attempted to meet with Plaintiff on May 6, 2020 to inform him of his termination, Plaintiff refused unless Schuster was present. (*Id.* ¶ 37.)

Plaintiff's employment with ASML was terminated on May 6, 2020. (Answer ¶ 60.) Upon terminating Plaintiff's employment, Defendant immediately notified USCIS of the

termination and withdrew its I-129H petition on Plaintiff's behalf. (Def.'s 56(a) ¶ 38.) Plaintiff's visa was revoked, and he returned to India on January 31, 2021. (*Id.*)

### C.    Procedural History

Plaintiff filed the Complaint on August 9, 2021. (Compl., ECF No. 1.) In July 2022, the Honorable Sarala V. Nagala dismissed Plaintiff's retaliation claim under Conn. Gen. Stat. § 31-51q. (ECF No. 24.) On August 22, 2022, Defendant filed its Answer. (Answer, ECF No. 28.)

On April 21, 2023, Kottapalli filed the instant motion for summary judgment. (Def.'s Mot., ECF No. 39.) Plaintiff opposed, and Defendant replied. (Pl.'s Opp., ECF No. 46; Def.'s Reply, ECF No. 49.)

## II.    <u>LEGAL STANDARD</u>

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[1] A fact is material when it "might affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. *Id.* The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir.

---

[1] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper. *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). However, if the non-moving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof and submits "merely colorable evidence," then summary judgment is appropriate. *Celotex*, 477 U.S. at 322–23; *Anderson* 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). There must be evidence on which the jury reasonably could find for it. *Dawson v. Cnty. of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004).

## III.   <u>DISCUSSION</u>

### A.     **Plaintiff's Discrimination Claim under Title VII (Count Three)**

Title VII prohibits discrimination based on protected characteristics, making it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Absent direct evidence of discrimination, Title VII claims are evaluated under the burden-shifting framework articulated in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792 (1973). *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 74 (2d Cir. 2015).

A plaintiff may first establish a *prima facie* case of discrimination by "produc[ing] minimal evidentiary support for the claim of discriminatory motivation." *Davis v. New York City Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015). In the second stage, if the plaintiff establishes a *prima facie* case, "the burden of production shifts to the [defendant] to articulate a non-discriminatory reason for the adverse employment action." *Davis*, 804 F.3d at 235. A defendant's "explanation of its legitimate nondiscriminatory reasons must be 'clear and specific.'" *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 381 (2d Cir. 2003) (quoting *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985)). At the third stage, once a defendant "has set forth its non-discriminatory justification, the plaintiff must then produce evidence capable of carrying the burden of persuasion that the [defendant's] action was at least in part motivated by discrimination." *Davis*, 804 F.3d at 235. "[W]hile a plaintiff *may* satisfy the third-stage burden under *McDonnell Douglas* by showing that the [defendant's] stated reason was false and just a pretext, or cover, for a discriminatory intent, a plaintiff is not *required* to demonstrate the falsity of the [defendant's] proffered reason." *Bart v. Golub Corp.*, 96 F.4th 566, 570 (2d Cir. 2024). "When the defendant offers a legitimate, nondiscriminatory reason for the adverse employment action, the burden is on the plaintiff to point to evidence that reasonably supports a finding of prohibited discrimination; otherwise, the defendant is entitled to summary judgment." *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013).

Defendant asserts that it is entitled to summary judgment on the disparate treatment claim because Plaintiff has failed to establish a *prima facie* case of discrimination. Under *McDonnell Douglas*, a plaintiff establishes a *prima facie* case of discrimination by showing

that (1) he is a member of a protected class; (2) he is qualified for his position; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *Bart*, 96 F.4th at 570. Defendant does not dispute the first two elements of the *prima facie* case. Instead, Defendant contends that Plaintiff's claim falls because Plaintiff was not subject to an adverse employment action and Plaintiff failed to show circumstances giving rise to an inference of discrimination by failing to identify similarly situated comparators who were treated more favorably. (Def.'s Mem., ECF No. 39, at 9–11.) For the reasons below, the Court finds that Plaintiff failed to establish a *prima facie* case of discrimination.

### 1.    Adverse Employment Actions

Plaintiff raises five theories of how Defendant discriminated against him due to his race or national origin: **(1)** in 2015, Plaintiff was denied a promotion to a senior design engineer position and was told that it was due to the longer time to complete green card process for Indian employees; **(2)** in 2018, Robert Wiener called Plaintiff a "lucky bastard" during a meeting in reference to Plaintiff being transferred from EUV to DUB after complaining about the patent application process; **(3)** Plaintiff was paid less within the pay scale that he was in comparison to other employees who were not Indian; **(4)** in 2019, Plaintiff was denied training due to being Indian; and **(5)** Plaintiff was transferred from DUV to EUV. (Pl.'s Opp. at 29–30.)

Plaintiff's first theory, that there was non-selection for a promotion in 2015, fails as a matter of law. Plaintiff does not address Defendant's contention that the Title VII discrimination claim is time-barred insofar as it relates to Plaintiff not being awarded the senior design engineer position in 2015. (*See generally* Pl.'s Opp.) The Court therefore finds that Plaintiff has abandoned the discrimination claim based on a failure to promote theory. *See*

*Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 103 (2d Cir. 2019) (finding an argument waived where a litigant did not argue in opposition to a motion). Even if not abandoned, the Court finds that the event is time-barred. Title VII claims are time-barred if the alleged unlawful practice occurred, at most, more than 300 days prior to the filing of a charge of discrimination. *Collins v. Fed. Express Corp.*, No. 3:22-CV-1472 (VDO), 2024 WL 1774123, at *5 (D. Conn. Apr. 25, 2024). Here, Kottapalli received a notice of right to sue from the EEOC on May 12, 2021. (Compl. ¶ 9.) Because nearly six years have passed between the alleged non-selection for a promotion in 2015 and the EEOC notice of right to sue, and Plaintiff has presented no evidence to explain that passage of time, no reasonable jury could find that the alleged failure to promote is timely.

Plaintiff's second theory, that he was called a "lucky bastard," is also insufficient to show an adverse employment action. While Plaintiff asserts that such a remark was used to bully him due his race and national origin, the Second Circuit has long held that "[s]tray remarks, even if made by a decision maker, do not constitute sufficient evidence to make out a case of employment discrimination." *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 (2d Cir. 1998); *accord Johnson v. Schmid*, 750 F. App'x 12, 17 (2d Cir. 2018) (finding that a "purported racial epithet does not raise a genuine dispute for trial"). Here, Plaintiff admits that there were no other comments made related to his race or national origin. (Pl.'s Dep., ECF No. 46-2, at 57:5–15.)[2]  Because Plaintiff proffers only one offensive remark from a decision maker

---

[2] Citations to Plaintiff's deposition refers to the deposition pagination, as opposed to the ECF pagination.

during his years of employment, Plaintiff has not shown that this event constitutes an adverse employment action.

With respect to the remaining theories—the denial of training, pay disparity, and involuntary transfer—the Court assumes, without deciding, that they were adverse employment actions. Defendant's contention that Plaintiff did not suffer an adverse employment action is grounded on the proposition that a plaintiff must show a material disadvantage resulting from an employer's action. (Def.'s Reply at 10.) Indeed, the Second Circuit has held that "[t]o qualify as an adverse employment action, the employer's action toward the plaintiff must be *materially adverse* with respect to the terms and conditions of employment." *Davis*, 804 F.3d at 235 (2d Cir. 2015) (emphasis added); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (same). But the Supreme Court has recently emphasized that the phrase "discriminate against" in Title VII "refer[s] to differences in treatment that injure employees." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. --, 144 S. Ct. 967, 974 (2024). In its decision resolving a Circuit split, the Supreme Court rejected numerous Circuit Court of Appeals decisions requiring a plaintiff to "meet a heightened threshold of harm—be it dubbed significant, serious, or something similar[,]" including the Second Circuit's "materially significant disadvantage" requirement for involuntary transfers to be adverse employment actions. *Id.* at 973, 974 n.1. Instead, a transferee bringing a claim under Title VII may "show some harm respecting an identifiable term or condition of employment," the specifics of which can include more than "economic or tangible" harm. *Id.* at 974. A plaintiff can still establish an involuntary transfer to be an adverse employment action even if "her rank and pay remained the same, or that she still could advance to other jobs." *Id.* at 977. While the Second Circuit has not yet opined on whether *Muldrow*

applies in circumstances outside of an involuntary transfer, other Circuit Court of Appeals have held that *Muldrow* obviated case law requiring all adverse employment actions to satisfy an elevated injury threshold. *See Cole v. Grp. Health Plan, Inc.*, 105 F.4th 1110, 1114 (8th Cir. 2024); *see also Peifer v. Bd. of Prob. & Parole*, 106 F.4th 270, 277 (3d Cir. 2024) ("Because *Muldrow* made clear that adverse employment action need not be serious, we will remand so that the District Court can consider in the first instance whether [Plaintiff] has asserted harms sufficient to establish 'some' employment-related harm for her prima facie case under *Muldrow*".). The Court need not resolve this legal question. As discussed below, Plaintiff's claims ultimately fail because there are no triable issues regarding circumstances giving rise to an inference of discrimination.

### 2.      Circumstances Giving Rise To An Inference Of Discrimination

Even if the denial of training, pay disparity, and involuntary transfer were adverse employment actions, Plaintiff has failed to establish a *prima facie* case of discrimination for these alleged events due to his failure to identify similarly situated comparators.

"[W]here a plaintiff seeks to make out h[is] *prima facie* case by pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must show that [he] shared sufficient employment characteristics with that comparator so that they could be considered similarly situated." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) (citing *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)). "A plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). A plaintiff need not show that he is similar to the comparator in all respects, but "the individuals with whom [the] plaintiff attempts to compare h[im]self must be

similarly situated in all material respects." *Doe v. City of N.Y.*, 473 F. App'x 24, 27 (2d Cir. 2012). "In the context of employee discipline, [ ] the plaintiff and the similarly situated employee[s] must have engaged in comparable conduct, that is, conduct of comparable seriousness." *Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 20 (2d Cir. 2015). While the question of whether employees are similarly situated is ordinarily a question of fact for the jury, *Mandell v. Cnty. of Suffolk,* 316 F.3d 368, 379 (2d Cir. 2003), this rule is "not absolute … and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499 n.2 (2d Cir. 2001).

Here, Plaintiff does not identify any similarly situated comparators. The only evidence mustered for the *prima facie* case is Plaintiff's deposition testimony. **First**, regarding the involuntary transfer, while Plaintiff asserts that he was only the only person in his group to be transferred, Plaintiff also admits that he does not know whether non-Indian employees were transferred without their permission. (Pl.'s Dep. at 70:6–23.) **Second**, regarding the pay disparity, Plaintiff similarly admits that he does not know how Defendant treated non-Indian employees. In response to being asked, "Do you believe that ASML discriminated against you on the basis of your national origin or other protected class in any other way?" Plaintiff answered:

> So when I see the discrepancy in the pay—pay amounts, so that which need to be investigated because I see every year we have certain papers sent in that—in that—what you call it, in the pay grade. In my documents, I noticed it was reduced.

(Pl.'s Dep. at 54:15–23.) Plaintiff later admits that he does not know what other non-Indian employees in his pay scale earned and that he did not have evidence to support his pay disparity

claim. (*Id.* at 55:9–18 (Q: So you—you believe that you may have made less than your similarly situated non-Indian peers, but you do not have any evidence to prove that at this time; is that correct? A: Yes.).) **Finally**, regarding the denial of training, Plaintiff testified that he believed that ASML denied him training in 2019 because ASML knew that he was in the country on an H-1B visa. (*Id.* at 54:10–14.) Plaintiff further testified that, despite the denial of his request, Defendant allowed unnamed colleagues to go to trade shows and trainings in 2019:

> I requested for a training, and I did not get any valid reasons why it was not provided to me. And they simply mentioned there is no budget, but I know the fact a lot of colleagues during that period went to other trade shows and other trainings and all. So if the investigation doesn't understand what happening internally, then they can get all this information.

(*Id.* at 52:12–19.) For all of the purported adverse employment actions, therefore, Plaintiff's deposition testimony shows "little more than conclusory statements" and "sweeping allegations unsupported by admissible evidence" that there was disparate treatment between similarly situated comparators, and thus fails to demonstrate circumstances giving rise to an inference of discrimination. *Shumway,* 118 F.3d at 64; *accord Hongyan Lu v. Chase Inv. Servs. Corp.*, 412 F. App'x 413, 418 (2d Cir. 2011).

Accordingly, because Plaintiff has not established a *prima facie* case, Defendant's summary judgment motion as to the discrimination claims is granted.

### B.    Plaintiff's Retaliation Claim under Title VII (Count Four)

Title VII includes an "antiretaliation provision" that "forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3). Retaliation claims under Title VII use the same

*McDonnell Douglas* burden-shifting framework. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). To establish a *prima facie* case of retaliation, Plaintiff must show: (1) participation in a protected activity known to Defendant; (2) an employment action that disadvantaged him; and (3) a causal connection between the protected activity and the adverse employment action. *Richardson v. Comm'n on Human Rts. & Opportunities*, 532 F.3d 114, 123 (2d Cir. 2008). Once a plaintiff establishes the *prima facie* case, the burden shifts to a defendant to proffer a "legitimate, nonretaliatory reason for the challenged employment decision," whereupon the burden shifts back to Plaintiff to demonstrate that Defendant's rationale is "merely a pretext for [the] impermissible retaliation." *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001).

Defendant contends that Plaintiff fails to establish a *prima face* case of retaliation, arguing: **(1)** Plaintiff did not engage in a protected activity; **(2)** Plaintiff's involuntary transfer was not an adverse action, and even if it was, Plaintiff has not shown that there was causation between a protected activity and the transfer; and **(3)** Plaintiff has not shown causation between a protected activity and the termination of employment. (Def.'s Mem. at 19-23.)

As an initial matter, Plaintiff does not oppose Defendant's second and third contentions in his opposition brief, and does not proffer evidence to support the element of causation between a protected activity and the involuntary transfer or termination. (Pl.'s Opp. at 30–32.) As a result, the Court finds that Plaintiff has abandoned the Title VII retaliation claim based on the involuntary transfer and termination of employment. *See Prime Int'l Trading, Ltd.*, 937 F.3d at 103; *see also Doughty v. Dep't of Dev. Servs. STS*, 607 F. App'x 97, 98 (2d Cir. 2015) (affirming dismissal of retaliation claim for being abandoned).

Plaintiff's waiver aside, the Court holds that the retaliation claim ultimately fails on the merits. In response to Defendant's first contention, Plaintiff asserts that he received a poor performance review after he "filed a complaint with HR after Mr. Winder made a derogatory comment … in connection with to his Indian national origin," and that "[t]here is a clear connection between the poor performance review and Plaintiff's protected activity based on the close timing of the two incidents." (Pl.'s Opp. at 31, 32.) The Court addresses each of these arguments in turn.

### 1.    Protected Activity

Plaintiff establishes that there are triable issues as to whether he engaged in a protected activity and whether Defendant was aware of that protected activity. Filing an internal complaint on one's own behalf can constitute a protected activity where a plaintiff "possessed a good faith belief that the underlying employment practice was unlawful" under Title VII. *Cieplinski v. Univ. of Conn. Health Ctr.*, No. 3:18-CV-1503 (JCH), 2019 WL 13273446, at *9 (D. Conn. July 25, 2019). It is undisputed that, in June/July 2018, Plaintiff notified Defendant's HR department that Wiener called him a "lucky bastard" during a meeting. (Pl.'s 56(a) ¶ 50; Pl.'s Opp. at 32.) Plaintiff further testified that he complained about the remark because it was an example of bullying from a colleague based on his race or national origin. (Pl.'s Dep. at 59.) In response to the complaint, a meeting was held with Defendant's HR personnel, in which Wiener apologized to Plaintiff. (*Id.* at 60:13-63:21.) The totality of the circumstances therefore includes sufficient evidence to show that Plaintiff's internal complaint was motivated by a good faith belief that the offensive remark violated Title VII. In short, Plaintiff's testimony establishes that there was sufficient information for Defendant to have "reasonably understood" the internal complaint to be directed at conduct prohibited by Title VII, namely

discrimination based on a protected characteristic. *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011).

### 2.    Adverse Employment Action

Plaintiff has established triable issues as to whether he suffered an adverse employment action. The adverse action standard for Title VII retaliation is slightly different from that of discrimination. The Supreme Court in *Burlington* expanded the definition of an adverse action for Title VII retaliation claims to include changes in employment outside the terms and conditions of employment. 548 U.S. at 64. The Supreme Court held that an adverse action in the retaliation context means "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 57. In Plaintiff's opposition brief, Plaintiff alleges a single purported adverse employment action: the receipt of a negative performance review from Wiener in 2018. (Pl.'s Opp. at 34.) Defendant does not dispute that Plaintiff received a negative performance review. (*See generally* Def.'s Reply.) "[F]or the purposes of a retaliation claim, bad performance reviews are an adverse employment action." *Siddiqi v. New York City Health & Hosps. Corp.*, 572 F. Supp. 2d 353, 372 (S.D.N.Y. 2008). Plaintiff has consequently established that the negative performance review is an adverse employment action.

### 3.    Causation

In December 2018, about five months after Plaintiff filed an internal complaint regarding Wiener's utterance of the offensive remark in June/July 2018, Plaintiff received a poor performance review from Wiener. (Pl.'s Opp. at 32.) Plaintiff asserts that the "close timing of the two incidents" shows that there is a "clear connection" between a protected activity and a single adverse employment action. (*Id.*)

While the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action[,]" *Gorman–Bakos v. Cornell Coop. Extension of Schnectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001), the Supreme Court has held that the protected activity and adverse employment action must occur "very close" to one another. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). A time period of five months between a protected activity and an adverse action may be sufficient to establish a causal relation where "the adverse action occurred at the first actual opportunity to retaliate." *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013). However, "an intervening event between the protected activity and the adverse employment action may defeat the inference of causation created by close temporal proximity." *Carter v. TD Bank, N.A.*, No. 3:20-CV-1616 (SVN), 2023 WL 3818589, at *12 (D. Conn. June 5, 2023), *aff'd*, No. 23-950, 2024 WL 2828470 (2d Cir. June 4, 2024) (finding that a time period of five months did not give rise to an inference of retaliation).

Here, Plaintiff fails to establish that a reasonable jury could infer a causal connection between a protected activity and an adverse employment action. Plaintiff relies on a period of five months to establish a causal connection between Plaintiff's internal complaint and the negative performance review. But Plaintiff's reliance on his own testimony, standing alone, does not present triable issues to overcome the gap between the events. The record shows that, before Plaintiff's negative performance review at the end of the year, Plaintiff's colleague, Andy Kohl, noted that he was unable to hold Plaintiff accountable for the technical deliverable of a project and that there was an instance where he had to raise his voice to lower the animosity in the room. (ECF No. 39-13 at 4.) Plaintiff does not provide any evidence to contradict Kohl's

feedback other than his own testimony denying Kohl's claims. But "conclusory assertions taken from [a plaintiff's] own deposition testimony" cannot show a genuine dispute of material fact. *Mejia v. Roma Cleaning, Inc.*, 751 F. App'x 134, 137 (2d Cir. 2018); *see also Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) (cautioning that permitting a plaintiff "to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars" would necessitate a trial in all discrimination cases). The failure to provide admissible evidence other than his own conclusory testimony precludes Plaintiff from establishing that Defendant retaliated against him five months later as a direct result of complaining about discrimination. *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 582 (S.D.N.Y. 2010) (finding gap of four months alone to be insufficient to establish a causal connection where there were non-refuted poor performance reports).

### 4. Legitimate, Non-Retaliatory Reasons

Even if Plaintiff raised a genuine dispute about causation, Defendant has produced evidence to articulate legitimate, non-retaliatory reasons for Plaintiff's poor performance evaluation. At the end of 2018, Plaintiff was rated "below expectations" for the "how" side of his job performance in his year-end PPM. (Def.'s 56(a) ¶ 17.) That performance review included Plaintiff's mid-year review, which noted complaints of Kottapalli being combative and raising his voice in meetings, and of Kottapalli responding negatively to direction for improvement:

> As part of the EUV RH team, [Kottapalli] was meeting expectations on the How. He has a strong Quality Focus and Sense of Ownership. However, [Kottapalli's] performance on the "How" side was below expectations on the DUV RH team. Feedback included that he seemed reluctant to join the project and "pushed back" initially on accepting tasks. Team members provided feedback that [Kottapalli's] was "combative" and difficult to work with, resulting in raised voices in meetings and with [Kottapalli] inappropriately escalating issues

> through emails copying line managers and senior project leadership instead of first trying to resolve things directly then through appropriate channels. Complaints were made about [Kottapalli] to Senior Management, after which [Kottapalli] responded negatively to directions for improvement including disputing that there was any issue with his performance.

(ECF No. 39-3 at 33.) This performance evaluation is corroborated by Kohl, who noted that there was an instance in which he had to raise his voice to lower the animosity involving Plaintiff in the room. (ECF No. 39-13, at 4.) The final appraisal on Plaintiff's performance also noted similar incidents, stating that Plaintiff needed to measure his response to teammates and show respect by not raising his voice:

> There have recently been a couple of incidents however, that have shown [Kottapalli] needs to continue to consciously measure his response to teammates. He will need to find more productive methods of providing feedback when he does not agree with others' work, ensuring that a calm and productive environment is maintained. He must show respect toward his teammates by not raising his voice when he disagrees with them.

(ECF No. 39-3 at 33.) As corroborated by documentary evidence, Defendant has shown that Plaintiff's poor performance evaluation was based on a litany of issues unrelated to the filing of the internal complaint, including colleagues complaining that Plaintiff was combative, difficult to work with, and unwilling to listen to directions for improvements. Defendant has therefore met its burden to articulate legitimate, non-retaliatory reasons for Plaintiff's poor performance evaluation. *See Palencar v. New York Power Auth.*, 834 F. App'x 647, 650–51 (2d Cir. 2020) (affirming summary judgment of no retaliation where, "as noted above with respect to [the] discrimination claims[,]" there were complaints that plaintiff "was consistently combative and defiant toward his superiors, and that he was unwilling to incorporate constructive feedback in response to his performance reviews over that time").

### 5. Pretext

Upon a defendant's articulation of a legitimate, non-retaliatory reason for an adverse employment action, the burden shifts back to Plaintiff to demonstrate that Defendant's rationale is "merely a pretext for [the] impermissible retaliation." *Cifra*, 252 F.3d at 216. A plaintiff may show pretext "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Palencar*, 834 F. App'x at 651.

The Court finds that, even if Plaintiff establishes a causal relationship between the internal complaint and the negative performance review, Plaintiff's retaliation claims ultimately fail because Plaintiff cannot establish pretext. Temporal proximity, without more, cannot demonstrate pretext. *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 90 (2d Cir. 2019). Moreover, the only evidence that Plaintiff relies on to show pretext is his own deposition testimony regarding his subjective disagreement with his performance evaluations, which, as described above, is undermined by the documentary evidence showing legitimate non-retaliatory reasons for the negative reviews.

Accordingly, no reasonable jury can find that the Defendant's proffered reasons for a negative performance review was merely a pretext for a discriminatory motive. Plaintiff's retaliation claim fails on the merit.

### C. Supplemental Jurisdiction

Plaintiff asserts that the jurisdiction of this Court was founded upon federal question jurisdiction and that there was supplemental jurisdiction over the state law claims. (Compl. ¶¶ 1–4.) Having dismissed Plaintiff's federal law claims, the Court declines to exercise supplemental jurisdiction over the remaining state law causes of action, including the wrongful

termination and negligence claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

## IV.    <u>CONCLUSION</u>

For the reasons stated above, Defendant's motion for summary judgment is **granted** as to Plaintiff's discrimination and retaliation claims under Title VII.

Given its declination of supplemental jurisdiction over the state law claims of wrongful discharge and negligence, the Court expresses no view as to whether summary judgment should enter as to those claims. As there are no remaining claims, the Clerk of Court is respectfully directed to enter judgment and close the case.

**SO ORDERED.**

Hartford, Connecticut
August 14, 2024

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge